Louis Pechman [LP-6395]  **ECF CASE**
Berke-Weiss & Pechman LLP
488 Madison Avenue
New York, New York 10022
(212) 583-9500
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DILENI RATNAYAKE,                              :      05 Civ. 4546 (JGK)
                                               :
                      Plaintiff,                :      **COMPLAINT**
                                               :
        - against -                           :      **PLAINTIFF DEMANDS**
                                               :      **A TRIAL BY JURY**
LEHMAN BROTHERS, INC.,                         :
                                               :
                      Defendant.                :
------------------------------------------------------------------------X

       Plaintiff Dileni Ratnayake ("Ratnayake" or "plaintiff"), by her attorneys, Berke-Weiss & Pechman LLP, complaining of defendant Lehman Brothers, Inc. ("Lehman" or "defendant"), alleges:

### NATURE OF THE ACTION

       1.     The Tsunami of December 26, 2004 devastated Dileni Ratnayake's home country of Sri Lanka.  With the knowledge and consent of Lehman, her employer, Ratnayake went to Sri Lanka to search for missing relatives and to help with the relief effort.  Stricken with illness in Sri Lanka, Ratnayake was compelled to return two weeks later than originally planned.  When she returned home to the United States, Ratnayake was informed by Lehman that she had been fired.  Incredibly, Lehman accused Ratnayake of abandoning her job of nine years, even though Lehman had approved her travel to Sri Lanka.  Indeed, Ratnayake even brought gifts for the children of Sri Lanka that she had received from her work colleagues.  Ratnayake's termination was in flagrant disregard of the Family and Medical Leave Act of 1974 and reflected another

example of persons of color being eliminated from the Listed Options department at Lehman in which Ratnayake worked.

  2. This action is brought to remedy discrimination and retaliation under the Family and Medical Leave Act 29 U.S.C. § 2601 *et seq.* ("FMLA") and to remedy discrimination on the basis of disability, race, and national origin in the terms, conditions, and privileges of employment under the New York State Executive Law § 290, *et seq.* ("Executive Law") and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-10 *et seq.* ("Human Rights Law").

  3. Defendant's actions were unlawful, and plaintiff brings this action for injunctive and declaratory relief, compensatory and punitive damages, attorneys' fees and other appropriate equitable and legal relief.

## JURISDICTION

  4. This Court has jurisdiction over plaintiff's FMLA claims under 29 U.S.C. § 2601, and has supplemental jurisdiction over plaintiff's claims under the Executive Law and Human Rights Law pursuant to 28 U.S.C. § 1367.

## JURISDICTIONAL PREREQUISITES

  5. Prior to the filing of this Complaint, Ratnayake served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York in accordance with N.Y.C. Admin. Code § 8-502(c).

## VENUE

  6. Venue for this action in the Southern District of New York under 28 U.S.C. § 1391 is appropriate as the residence of Ratnayake, the principal place of business of

Lehman, and the location where Ratnayake worked at the time the unlawful acts occurred, are located in the Southern District of New York.

## PARTIES

7.      Ratnayake is a permanent resident of the United States and resides at 205 West 123rd Street, Apt. 4, New York, New York 10027.

8.      Ratnayake's race is Asian Indian; her national origin is Sri Lankan.

9.      Defendant Lehman is a global investment bank, serving institutional, corporate, government and high-net-worth individual clients and customers.  Its business includes capital raising for clients through securities underwriting and direct placements, corporate finance and strategic advisory services, securities sales and trading, research, the trading of foreign exchange and derivative products and certain commodities, asset management for high-net-worth and institutional clients and private equity investments.  Lehman is a member of all principal securities and commodities exchanges in the United States, as well as NASD, Inc., and holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris and Milan stock exchanges.  Lehman employs approximately 20,000 employees worldwide.

10.     Defendant Lehman's world headquarters is located at 745 Seventh Avenue, New York, NY  10019.  At the time of her termination from Lehman, Ratnayake worked out of Lehman's 745 Seventh Avenue location.

## FACTS

**Ratnayake's Background at Lehman**

11.     Ratnayake commenced employment with Lehman on August 12, 1996.

12.     Ratnayake began her career at Lehman as an Administrative Assistant in the Expense Management department.  In October 1999, Ratnayake joined the Equity Derivative Operations department as an Administrative Coordinator to the head of Equity Derivative Operations, Bill Arnold ("Arnold").  Within eight (8) months, Arnold promoted Ratnayake to the position of Analyst in Equity Settlement.  In 2003, the Equity Settlement group in which Ratnayake worked became a part of the Listed Options department.

13.     Ratnayake consistently received favorable reviews during her time at Lehman.  In a 2003 year-end Performance and Development Review ("2003 Review"), Sean Conahan ("Conahan"), Vice President of New York Equity Derivative MO, writes favorably of Ratnayake's performance:

- Dileni always has the Firm's best interest in mind.

- Dileni's communication and interpersonal skills have allowed her to face off with internal business people as well as CMTA clients with equal effectiveness.  Dileni has done a good job keeping her managers advised of progress toward the VVA implementation.

- Dileni is very hard working.  When tasked with a piece of work, Dileni is thorough in her investigation and follows up in a timely manner.  Dileni was asked to personally deliver on an extraordinary amount of work related to the historical CMTA project and had little opportunity to delegate.

- Dileni has been very resourceful in managing the CMTA process during times of heavy turnover.  Dileni took on a great deal of responsibility with very little notice as Mike Sergio left the firm.

- Dileni has broad knowledge across several operational disciplines.  Dileni is the expert in many areas including CMTA, client valuations, physical settlements, basket movements and other settlement and sales support related activities.  Dileni's knowledge can be extremely valuable, especially in educating the junior staff.

- Dileni delivers creative solutions to challenging problems on a frequent basis.  Dileni is analytical and persistent in her approach.

> When presented with a challenge, Dileni is quick to rise to the occasion. Dileni's strengths in this area help her prioritize chronic issues in an extremely manual CMTA environment.

14. On or about December 1, 2003, Ratnayake came under the supervision of Erica A. Smoller ("Smoller"), Vice President of Listed Options, and Kirk Butryn ("Butryn"), Senior Vice President of Cash/Program and Listed Trading Operations.

15. Minority employees are significantly under-represented in Lehman's Listed Options department as well as in Lehman's Equity Derivative Operations department. During Ratnayake's time in the Equity Derivative Operations department, there were only 10 to 18 minorities out of 95 employees. In Butryn's group, there were 5 to 8 minorities out of a total of 43 employees.

16. During Ratnayake's tenure as a Senior Settlements and CMTA Analyst under Butryn and Smoller, four minorities, Beverly Gordon (African American), Francine Weston (African American), Sonia Wilson (African American), and Ratnayake (Asian Indian), were fired and three whites were directly hired by Smoller, Brian Sullivan ("Sullivan"), John McCauliffe ("McCauliffe"), and Jeff Masopust ("Masopust"). As a result, Lehman has no minority representation in its Listed Options department under Smoller.

17. In November of 2004, Beverly Gordon ("Gordon"), an African-American co-worker of Ratnayake, called in sick. Smoller played Gordon's voicemail to a group of co-workers Sullivan, McCauliffe, and Masopust, all Caucasian. Saying, "Boys I have a treat for you," Smoller proceeded to ridicule Gordon's voicemail in which Gordon explained that she had a severe headache and was going to the doctor. As Ratnayake's desk is in front of Smoller's, she heard the entire incident and confronted Smoller. When Ratnayake said, "that's not nice, I am now concerned that you will play my

voicemails when I call in sick," Smoller responded by saying, "don't worry, you don't sound like you are in deathbed when you call in."

**Ratnayake's Leave and Termination**

18. Ratnayake has traveled to Sri Lanka every year since 1996 during her company-provided vacations to visit her mother. On each visit, Ratnayake timely returned to work, except in January 2004 when she extended her stay, with Butryn's approval, due to her mother's surgery.

19. Prior to leaving for Sri Lanka on January 10, 2005, Ratnayake visited Dr. Kallish ("Dr. Kallish"), a visiting doctor at Lehman Medical Center, who gave her typhoid, hepatitis A/B, measles and mumps, polio and malaria shots.

20. Ratnayake received approval from Smoller to take a vacation from January 10 to January 31, 2005 to visit Sri Lanka, where her immediate and extended family were directly affected by the December 26, 2004 Tsunami.

21. Between January 10 and January 25, 2005, Ratnayake traveled the east coast of Sri Lanka with Annette Westerlund ("Westerlund"), a Swedish photo-journalist for the newspaper *Ulricehamns Tidnings*, as a part of a private relief effort, distributing toys, food, medicine, and clothing to affected areas. Westerlund was documenting the story of Maryanne, a Sri Lankan-Swede who had arrived with 80 tons of relief goods. Ratnayake joined their efforts, visiting camps, distributing toys, comforting the children, and translating for the group.

22. Ratnayake arrived in Sri Lanka with a cold, and by the time the group arrived in Colombo, Sri Lanka on January 25, 2005, Ratnayake's flu-like symptoms had worsened. Ratnayake remained in Colombo to recover while the rest of the group continued on.

23. On January 26, 2005, Ratnayake emailed her supervisor, Smoller, to inform Smoller of her condition:

> Just check out the link for my pix. I did my tsunami thing with a swedish journalist and a sri lankan group, we traveled all around Sri Lanka, have more pix of all toys and stuff will forward asap.
>
> I have been sick since I got back yesterday, sounds like mumps like symptoms, swollen glands, etc, we have been sleeping in Army camps etc, so it was abit hard but all worth it. x please could you check with DR. Scott Kallish if his shots covered that, I know that I got one for Measles, not sure whether mumps was covered, i am going to a DR. tomorrow, and will know the outcome. I will call you on Thursday once I know whats wrong, my mom thinks its mumps. My cell is 0723-471100.
>
> Please ask Dr. Kallish, I am abit worried. and e-mail me back. Thanks D.

24. On January 28, 2005, Ratnayake called Smoller on her friend Eranthika Fernando's ("Fernando") mobile phone to inform her of her doctor's appointment for January 31, the earliest time available. Although Ratnayake tried four times to reach Smoller by phone, she continued to receive the "Network Busy" message. Believing she simply had a bad case of the flu and fully expecting to return to the U.S., Ratnayake had not rescheduled her flight reservations yet.

25. On January 31, 2005, Dr. D. D. Edirisinghe ("Dr. Edirisinghe") at the Pitakotte Clinic diagnosed Ratnayake's condition as the mumps:

> Miss Dileni Ratnayake 43 yr, 18, Mission Lane, Pita-Kotte, Kotte, presented to me with fever & swelling of cheeks today. On examination I diagnosed as viral parotitus (MUMPS). I recommend her two weeks medical leave from 01/2/2005.

26. On January 31, 2005 at 11 a.m., immediately after her doctor's appointment, Ratnayake again called Smoller on Fernando's mobile phone and left

7

Smoller a voicemail message, in which she notified Smoller that she would not be able to return to work on January 31, her previously planned return date.  Ratnayake also left Fernando's phone number at which she asked Smoller to contact her.  Jennifer Becker ("Becker"), the Human Resources Generalist, still had Ratnayake's phone message saved, which she played for Ratnayake on February 15.

27. On February 11, 2005, Ratnayake was cleared for travel by Dr. Edirisinghe, and reserved the first available flight to New York, which was on February 14, 2005.

28. On February 12, 2005, Ratnayake sent an email to Smoller and Butryn from an internet café, advising them of her return to work on February 15, 2005:

> Hello Erica:
> I will be arriving in NY on 2/14 and will be back at work on tuesday 2/15.  I feel better but just a bit aloof.  I got all paper work from my Doctor with my condition.  He said that I should be OK to travel . . .  am kinda bored here now can't wait to be in NY and get back to my routine again.  It's really hot here . . . didn't realize how much I miss cold weather.  sounds crazy!  I got lots of gifts from Sri Lanka for you bev and the boys!
> See you!
> D

29. On February 15, 2005, Ratnayake returned to work at her usual starting time of 7:30 a.m.  When Ratnayake entered her password on her computer, however, she discovered that her access was denied.  Smoller told Ratnayake she knew why, and that Ratnayake needed to see Becker.

30. At 8:30 a.m., Butryn escorted Ratnayake to Becker's office for a meeting. Becker stated that they had expected Ratnayake back at work on January 31 and had not heard from Ratnayake by that date.  Ratnayake described the series of emails and phone calls she had made to keep in touch with Lehman and explained her medical

condition.  Becker replied that Smoller had not received Ratnayake's January 26 email and stated that the phone message Ratnayake left was unclear.  Becker told Ratnayake that she was terminated due to "job abandonment."

      31.    Becker also told Ratnayake that Lehman had already sent Ratnayake's termination letter to her home, and her landlord, Mr. Haines, had signed for it.  The termination letter read:

> Dear Dileni:
>
> For the past three days, I have sent you correspondence via overnight mail requesting that you contact me to discuss your continued unapproved absence from work and your employment status with the Firm.  You have not contacted me or any of your managers following receipt of these letters.
>
> Under these circumstances, Dileni, we consider you to have abandoned your job with Lehman Brothers, and therefore accept your resignation from the Firm, effective February 11, 2005.  I am enclosing a Guide to Leaving Lehman Brothers which contains information about benefits continuation and other matters related to the termination of your employment.
>
> If you have any questions, I can be reached at (201) 499-4976.
>
> Regards, Donna Fowler, Operations Human Resources, 201-449-4976

      32.    Ratnayake gave Becker the medical leave letter from Dr. Edirisinghe, to which she had referred in her January 26 email to Smoller.  She told Becker that there must have been a misunderstanding, since Ratnayake had contacted Smoller by email and telephone prior to January 31.  Ratnayake pleaded that she had had no intention of abandoning her job at Lehman after eight and half years of service, and offered to provide Becker with her return ticket to show her full intention of returning to work.  Becker asked Ratnayake to forward her the return ticket.  Becker also stated that she

was concerned Ratnayake might be contagious, and told Ratnayake to go home and recover. She also told Ratnayake that she would call her after speaking with Dr. Kallish.

33. Around 1:30 p.m. on the same day, Ratnayake received a call from Dr. Kallish, who informed her that it was possible for her to have caught the mumps despite the shots she took for measles and mumps on January 6, 2005. He asked Ratnayake to see a doctor and wanted her to schedule Hepatitis shots when she returned to work.

34. Later that day around 5:00 p.m., Becker called Ratnayake and informed her that Lehman would be paying for the two weeks medical leave, from January 31 to February 14, 2005, advised by Dr. Edirisinghe in Sri Lanka, as well as any other medical expenses if she was still sick. Ratnayake replied that she wanted to return to work, to which Becker responded that she was terminated. Becker told Ratnayake to "move on" and find another job -- there was nothing more Lehman could do. Ratnayake expressed her shock at the situation, especially in light of all her efforts to contact Smoller by email and phone, and Butryn by email. Becker responded by asking Ratnayake "why did you travel if you knew the risk involved?"

35. Lehman's response to Ratnayake's alleged job abandonment also is questionable in light of Lehman's process -- effective after September 11th -- of updating each employee's personal information, including emergency contacts, every three months. Lehman inexplicably failed to contact Ratnayake's emergency contact, Perine Fernando ("Fernando"), to inquire of Ratnayake's whereabouts or her situation in Sri Lanka.

## FIRST CLAIM
### (Discrimination and Retaliation Under the FMLA)

36. Plaintiff hereby realleges each allegation contained in paragraphs 1 through 35 as if fully set forth herein.

37. Lehman is an "employer" within the meaning of the FMLA, 29 U.S.C. § 2611(4)(a).

38. Ratnayake was an "employee" within the meaning of the FMLA, eligible to enjoy the benefits provided by the FMLA.

39. The mumps which afflicted Ratnayake in January of 2005 are a "serious medical condition" under the FMLA.

40. Under the FMLA, Ratnayake was entitled to take up to twelve weeks of unpaid leave for her serious medical condition.

41. Ratnayake suffered an adverse employment decision, namely her termination in retaliation for her exercising her right to take FMLA leave.

42. As a result of defendant's discriminatory and retaliatory acts, Ratnayake has suffered and will continue to suffer substantial losses incurred in the loss of past and future earnings, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

## SECOND CLAIM
### (Disability Discrimination Under the New York City Human Rights Law - Unlawful Termination)

43. Plaintiff hereby realleges each allegation contained in paragraphs 1 through 42 as if fully set forth herein.

44. Lehman is an "employer" within the meaning of the New York City Human Rights Law.

11

45. Disability is defined under the New York City Human Rights Law as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." Administrative Code of the City of New York, § 8-102 (16)(a).

46. The mumps which afflicted Ratnayake, is a disability under the New York City Human Rights Law.

47. Lehman discriminated against Ratnayake in violation of the New York City Human Rights Law by terminating her because of her disability, and by failing to provide her with a reasonable accommodation (*i.e.* leave of absence) for her disability.

48. As a result of Lehman's discriminatory acts, Ratnayake has suffered and will continue to suffer substantial losses incurred in loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia,* mental anguish, emotional distress and humiliation.

49. Lehman acted intentionally and with malice and reckless indifference to plaintiff's rights under the New York City Human Rights Law and is thereby liable to plaintiff for punitive damages under the New York City Human Rights Law.

**THIRD CLAIM**
**(Disability Discrimination Under the**
**New York State Executive Law – Unlawful Termination)**

50. Plaintiff repeats and realleges paragraphs 1 through 49 of this Complaint as if set forth herein.

51. Lehman is an "employer" within the meaning of the Executive Law.

52. Disability is defined under the Executive Law as "(a) physical mental or medical impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an

impairment or (c) a condition regarded by others as such an impairment, provided, however, that all provisions of this article dealing with employment, the term shall be limited to disabilities which do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." New York Executive Law § 292(21).

53. The mumps which afflicted Ratnayake are a disability within the meaning of the Executive Law.

54. Lehman discriminated against Ratnayake in violation of the Executive Law by terminating her because of her disability, and by failing to provide her a reasonable accommodation (*i.e.* leave of absence) for her disability.

55. As a result of Lehman's discriminatory acts, plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia,* mental anguish, emotional distress and humiliation.

**FOURTH CLAIM**
**(Race and National Origin Discrimination Under the New York**
**City Human Rights Law – Unlawful Termination)**

56. Plaintiff hereby realleges each allegation contained in paragraphs 1 through 55 as if fully set forth herein.

57. Defendant Lehman is an "employer" within the meaning of the New York City Human Rights Law.

58. Lehman discriminated against Ratnayake in violation of the New York City Human Rights Law by terminating her because of her race and national origin.

59. At Lehman, there exists a pattern and practice of discrimination against persons of color, as reflected in its gross under-representation of minorities firm-wide,

and the systematic elimination of persons of color in the Listed Options department by Smoller.

60. As a result of Lehman's discriminatory acts, Ratnayake has suffered and will continue to suffer substantial losses incurred in the loss of past and future earnings, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

61. Lehman acted intentionally and with malice and reckless indifference to plaintiff's rights under the New York City Human Rights Law and are thereby liable to plaintiff for punitive damages under the New York City Human Rights Law.

### FIFTH CLAIM
### (Race and National Origin Discrimination Under the
### New York State Executive Law – Unlawful Termination)

62. Plaintiff repeats and realleges paragraphs 1 through 61 of this Complaint as if set forth herein.

63. Defendant Lehman is an "employer" within the meaning of the Executive Law.

64. Lehman discriminated against Ratnayake in violation of the Executive Law by terminating her because of her race and national origin.

65. As a result of Lehman's discriminatory acts, plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages for, *inter alia,* mental anguish, emotional distress and humiliation.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) declaring that the acts and practices complained of herein are in violation of the Executive Law, the New York City Human Rights Law, and the Family and Medical Leave Act;

(b) enjoining and permanently restraining these violations of the Executive Law, the New York City Human Rights Law, and the Family and Medical Leave Act;

(c) directing such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to reinstate plaintiff in the position plaintiff would be in but for their discriminatory and unlawful acts, and to make plaintiff whole for all earnings she would have received but for defendant's discriminatory and unlawful treatment, including, lost commissions, wages, health insurance and other fringe benefits, bonuses, pension, front-pay, and other lost employment benefits;

(e) directing defendant to pay plaintiff compensatory damages for, *inter alia,* mental anguish, emotional distress and humiliation;

(f) directing defendant to pay plaintiff punitive damages for its intentional disregard of and reckless indifference to plaintiff's rights in the amount of $15 million dollars;

(g) directing defendant to pay plaintiff liquidated damages in an amount representing double the amount of the plaintiff's lost earnings;

(h) awarding plaintiff the costs of this action together with reasonable attorneys' fees; and

(i) awarding such other and further relief as this Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
May 10, 2005

        BERKE-WEISS & PECHMAN LLP

By: _____s/_____
Louis Pechman [LP-6395]
*Attorneys for Plaintiff*
488 Madison Avenue, 11th Floor
New York, New York 10022
(212) 583-9500